**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BARRY D. NELSON,

Defendant-Appellant.

No. 05-3121

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 04-CR-20048-01-JWL)

Leon Patton, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Kansas City, Kansas, for Plaintiff-Appellee.

Charles D. Dedmon, First Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with him on the brief), Kansas City, Kansas, for Defendant-Appellant.

Before **MCCONNELL** and **BALDOCK**, Circuit Judges, and **ARMIJO**, District Judge.[*]

**ARMIJO**, District Judge.

---

[*] The Honorable M. Christina Armijo, United States District Judge, District of New Mexico, sitting by designation.

Defendant Barry D. Nelson appeals his conviction as to all six counts of an indictment charging him with drug-trafficking and firearms offenses. We exercise jurisdiction under 28 U.S.C. § 1291, and we affirm the judgment of the district court for the reasons set forth below.

Before trial, a state court judge issued a search warrant for Mr. Nelson's residence after receiving an affidavit from a police detective that recounted how confidential informants made controlled drug purchases from that residence while under police surveillance. The police executed the search warrant and arrested Mr. Nelson. After being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Mr. Nelson asked a detective what the police had found in the residence. The detective told him that the execution of the search warrant resulted in the seizure of cocaine, marijuana, PCP, a gun, and documents. Mr. Nelson replied by saying "*I guess I'm ready to go to jail then.*" He subsequently moved to suppress that statement, as well as the evidence found during the execution of the search warrant. At trial, he challenged the prosecutor's peremptory strike of an African-American veniremember pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court denied Mr. Nelson's challenge to this peremptory strike, as well as his motions to suppress and his pre-trial request for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978).

I.

We first analyze Mr. Nelson's *Batson* challenge. The district court's jury-selection procedure involved seating a panel of 32 prospective jurors and hearing challenges for cause at bench conferences with the attorneys during voir dire. The veniremembers who were successfully challenged for cause were replaced by other prospective jurors who were added to the panel being questioned, and the voir dire continued. After the voir dire process and the challenges for cause were completed, there remained three African Americans on the panel, and the prosecutor used her peremptory strikes to remove all three of them from the jury.

One of these individuals was an elderly gentleman who frequented the bathroom twice during voir dire and, according to Mr. Nelson's counsel, was "not paying attention." Mr. Nelson does not contest the prosecutor's use of a peremptory strike to keep this gentleman from serving on the jury. But Mr. Nelson did object to the prosecutor's other two peremptory strikes of African American veniremembers.

The prosecutor's stated reasons for striking the second African American veniremember were that she seemed confused about her prior jury experience, had difficulty recalling some things about her step-children, and was uninformed about a son's prior drug use, all of which might have been attributable to her age. The district court disagreed with the prosecutor's assessment that this individual's difficulty answering questions meant she was confused, stating "I don't see any evidence of confusion about [her]. I think--I just don't see that there." Acknowledging that the prosecutor's stated rationale for striking this

particular veniremember was "more difficult" to analyze because it concerned "the way in which she answered questions" rather than the content of her answers, the district court sustained Mr. Nelson's objection to the prosecutor's peremptory strike of this veniremember. She remained as the only African American to sit on the jury.

In response to Mr. Nelson's *Batson* objection, the prosecutor explained her rationale for striking the third African American veniremember as follows:

> Judge, specifically regarding those two jurors, I'll take them in order that I struck them. I actually struck Mr. H.[2] He was my fourth strike. And I struck Mr. H. primarily because of his occupation. He's a college professor, and in my experience individuals who are professors will--they think--I shouldn't-- I'm a teacher so I shouldn't say this. But we think we know a lot and we're typically very opinionated. The only other--there were initially three college instructors on the jury panel. One, I think, was eliminated for cause, and without even paying attention to their racial background, I made that notation right away on my docket sheet. The only other college instructor that remained was Ms. T., and she was actually my second strike. So I struck both of those individuals primarily for that reason, based upon their occupation. I don't--there are a number of professions in particular about--being a college instructor or a teacher on that level is somebody that I typically eliminate.

At the beginning of voir dire, the prosecutor introduced herself to the jury and informed them that in addition to her work as a prosecutor, she taught four classes as an adjunct professor for Kansas City Kansas Community College. The prosecutor did not, however, specifically query the African American college professor about his occupation or education at that time. Rather, this information was disclosed later in the voir dire process

---

[2]Out of respect for the veniremembers' privacy, we redact their full names and refer to them only by the initial of their last name.

- 4 -

in response to a series of stock questions that the district court asked each member of the panel.

The district court introduced these stock questions as follows:

> Now, Ms. Scheurer,[2] let's let me be quiet for a second and let the jurors each talk. I want to start with Ms. S., and, if you would, please, just go through and answer the questions that are up there on your screen. And for those of you who don't have a screen, you're getting a little handout. You may proceed.

When it became his turn to answer, the prospective juror who is the subject of Mr. Nelson's *Batson* challenge responded as follows:

> MR. H.: I come from Lawrence, Kansas. My occupation is a college professor. I have a Ph.D. My wife is also a college professor. She has a Ph.D. I have one child who is 22 who works and lives outside of New York City, and she's in data analysis.
>
> THE COURT: Thank you. What is the area in which you teach?
>
> MR. H: American literature.
>
> THE COURT: All right. Thanks.

At an earlier point during voir dire, this veniremember stated that he had previously served on a jury "about eight years ago, Center County in Pennsylvania, and a guy was up for stealing something from Sears." This statement was in response to another stock question that the district court asked the entire panel, and the context in which it was elicited does not suggest that he was treated differently from other members of the venire. The prosecutor did

---

[2]Ms. Scheurer was the Courtroom Deputy.

- 5 -

not ask him any follow-up questions about his prior jury service or any of the other topics he covered in his answers to the district court's stock questions.

On this record, the district court was persuaded that the prosecutor had a credible reason for striking the African American college professor that did not implicate an invidious discriminatory purpose. The district court noted that the teaching profession "does perhaps mark a person as someone who in a jury might be more persuasive" and have "more tendency to control the outcome." In addition, the district court found that the prosecutor was applying this rationale in a race-neutral manner because she also struck another member of the panel who had taught at the college level but was not African-American.

We analyze Mr. Nelson's *Batson* challenge under the burden-shifting framework recently clarified by the Supreme Court in *Johnson v. California*, 125 S. Ct. 2410, 2416 (2005). Under this framework, the party challenging a peremptory strike of a prospective juror "must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Id.* (quoting *Batson*, 476 U.S. at 93-94). In *Johnson*, the Supreme Court clarified that it "did not intend the first step [of the *Batson* inquiry] to be so onerous that a defendant would have to persuade the judge--on the basis of all the facts, some of which are impossible for the defendant to know with certainty--that the challenge was more likely than not the product of purposeful discrimination." *Id.* at 2416.

When a defendant succeeds in making out a prima facie case, "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral

justifications for the strikes." *Id.* (quoting *Batson*, 476 U.S. at 94). "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 126 S. Ct. 969, 973-74 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam)). On appeal, "we review *de novo* whether the striking party's proffered explanation is race neutral" for purposes of satisfying the second step of the *Batson* inquiry. *United States v. Castorena-Jaime*, 285 F.3d 916, 927 (10th Cir. 2002).

Finally, "'[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.'" *Johnson*, 125 S. Ct. at 2416 (quoting *Purkett*, 514 U.S. at 767). "This final step involves evaluating the 'persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Rice*, 126 S. Ct. at 974 (quoting *Purkett*, 514 U.S. at 768). The district court's answer to "'the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal,'" because such a finding largely turns on the trial court's "evaluation of the prosecutor's credibility." *United States v. Sneed*, 34 F.3d 1570, 1579 (10th Cir.1994) (quoting *Hernandez v. New York*, 500 U.S. 352, 364 (1991)); *accord Rice*, 126 S. Ct. at 974-76. Thus, on direct appeal, "[w]e review for clear error the district court's finding of whether the striking party had discriminatory intent." *Castorena-Jaime*, 285 F.3d at 927.

To determine whether purposeful discrimination was present in the selection of a jury, we may consider a variety of factors, including: (1) the percentage of African American veniremembers who are the subject of the prosecutor's peremptory strikes, *Miller-El v. Dretke*, 125 S. Ct. 2317, 2325 (2005); (2) "side-by-side comparisons of some black venire panelists who were struck and white panelists who were allowed to serve" in order to determine whether "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve," *id.*; (3) the prosecutor's use of procedural mechanisms such as the Texas "jury shuffle" to move African American veniremembers to the back of the panel where they are less likely to be selected, *id.* at 2332-33; (4) evidence of a contrast between the prosecutor's "voir dire questions posed respectively to black and nonblack panel members," *id.* at 2333, where such contrast indicates an intent to load the questions in order to "make a case for excluding black panel members," *id.* at 2336, or "to create cause to strike," *id.* at 2337; and (5) evidence of a systematic policy or practice within the prosecutor's office of "excluding minorities from jury service," *id.* at 2339.

A detailed review of each of these factors may be especially pertinent in death-penalty cases such as *Miller-El*, which involved an extensive record developed through several years of habeas corpus proceedings. But we do not require such extensive detail in the context of hearing a direct appeal in this case--where the parties adequately developed the record and the district court made its rulings during the course of a single afternoon of voir dire while the venire was waiting for a jury to be seated so the trial

could proceed. In this context, the absence of evidence suggesting a pattern or practice of racial discrimination in other cases does not necessarily preclude Mr. Nelson from prevailing on his *Batson* challenge, because it is possible for an inference of discriminatory purpose to arise solely from the record of the voir dire and jury selection in one case alone. *See Johnson*, 125 S. Ct. at 2416 n.5. By the same token, a failure by the prosecutor or the district court to discuss one or more of the *Miller-El* factors in detail does not necessarily undermine a finding that a peremptory strike was not used for a racially discriminatory purpose, because the prosecutor and the district court may be similarly limited to those factors which are developed in the record before them in a particular case.

In this case, the district court applied the correct analytical framework and did not impose an onerous burden of persuasion as part of Mr. Nelson's *prima facie* case. Before ruling on Mr. Nelson's *Batson* challenges, the district court heard the prosecutor's explanation for the peremptory strikes, and thus the type of error identified in *Johnson* did not occur here. *See Rice*, 126 S. Ct. at 972-973.

We also conclude that the prosecutor's stated reason for striking the African American college professor was race-neutral and met the second step of the *Batson* test. There is no racially discriminatory intent inherent in the prosecutor's explanation of why she thought teachers or other highly educated persons do not make good jurors. *See United States v. Johnson*, 4 F.3d 904, 913-14 (10th Cir. 1993); *United States v. Velazquez-Rivera*, 366 F.3d 661, 666 (8th Cir. 2004).

Mr. Nelson contends that even if the prosecutor's explanation was race-neutral on its face under the second step of the *Batson* inquiry, it is not credible or persuasive enough to pass the third step of this inquiry. He further contends that the district court failed to carefully scrutinize the prosecutor's stated rationale in order to find out whether it was merely a pretext asserted for the purpose of dissimulating an underlying racial motive. In particular, Mr. Nelson asserts that the district court should have attached more significance to the fact that the prosecutor initially used her peremptory strikes to remove all three of the African American veniremembers from the jury. He also claims that the district court's rulings on his two *Batson* objections are inconsistent because one of these objections was sustained and the other was overruled. According to Mr. Nelson, the prosecutor's failed attempt at explaining the reasons for her peremptory strike of the second African American veniremember undermines her credibility as to the real reasons for striking the third African American veniremember as well.

We agree with Mr. Nelson that the prosecutor's use of peremptory strikes directed at other African American veniremembers is a relevant factor to be considered in completing the third step of the *Batson* inquiry. *See Miller-El*, 125 S. Ct. at 2325. It does not follow, however, that the district court was required to rule the same way with respect to each of the peremptory strikes that Mr. Nelson challenged under *Batson*. The record in this case indicates that there were significant factual differences among each of the three African American veniremembers who were the subject of the prosecutor's peremptory

strikes, and the district court properly conducted an individualized *Batson* inquiry as to each peremptory strike that Mr. Nelson challenged.

The district court's analysis expressly considered another relevant factor discussed in *Miller-El*, namely the side-by-side comparison between black and white veniremembers to determine whether "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack" panelist. *Id.* at 2325; *see also Rice*, 126 S. Ct. at 977 (concluding that a prosecutor's explanation for a peremptory strike of an African American female juror "could be seen as race neutral" where the same explanation also applied to "a peremptory strike on a white male juror"). This factor does not undermine the prosecutor's stated reason for striking the African American college professor, because the prosecutor also struck the other prospective juror who taught at the college level but was not African American.

In addition, the record indicates that the African American college professor disclosed his occupation in response to stock questions that the district court asked of each veniremember on the panel. None of this information came to light as a result of follow-up questions from the prosecutor that would suggest an intent to "make a case for excluding black panel members," *Miller-El*, 125 S. Ct. at 2336, or "to create cause to strike," *id.* at 2337. On the contrary, it was the nonblack teacher who was subjected to the type of concerted follow-up questioning that might be associated with an effort to create a pretextual reason for striking an otherwise qualified veniremember. Thus, a

comparison of the voir dire questions posed respectively to black and nonblack panel members does not reveal clear error in the district court's findings.

Finally, Mr. Nelson has not come forward with any evidence of a systematic policy or practice of racial exclusion within the prosecutor's office, nor is there evidence of any unusual procedural mechanisms such as the Texas "jury shuffle." The absence of such evidence makes this case readily distinguishable from *Miller-El*.

Thus, we are left with a situation where Mr. Nelson has pointed to at least one relevant factor in support of his remaining *Batson* challenge (namely the use of peremptory strikes directed at other African American veniremembers), but there remain several other factors that the district court was entitled to weigh and consider in evaluating the credibility and persuasiveness of the prosecutor's stated justification for the peremptory strike that is the subject of this appeal. Affording deference to the district court's credibility findings which are central to the question of discriminatory intent, *see Rice*, 126 S. Ct. at 974; *Sneed*, 34 F.3d at 1579, we conclude that Mr. Nelson has not met his burden of showing clear error in the district court's weighing of these factors.

II.

We next turn to the issues raised by the admission of a post-arrest statement attributed to Mr. Nelson. According to the testimony of a police detective, Mr. Nelson made the statement in question after the detective had arrested him, served him with a search warrant, conducted a search of his apartment pursuant to the warrant, and then returned to the police station where Mr. Nelson was being held pending his transfer to the

local jail. After returning to the police station from the scene of the search, the detective proceeded to advise Mr. Nelson of his rights under *Miranda*, using a written "advice of rights" form. The detective had just finished reviewing the form with Mr. Nelson and was asking him if he would sign the "waiver of rights" portion of the form when Mr. Nelson changed the subject of the conversation by asking the detective what was found in the apartment. The detective responded that the police had found cocaine, marijuana, PCP, a gun, and documents in the apartment. According to the detective, Mr. Nelson immediately replied by stating: "*I guess I'm ready to go to jail then.*" Upon hearing this statement, the detective discontinued his questioning at the police station and arranged for Mr. Nelson to be transported to jail.

The district court denied Mr. Nelson's motion to suppress this post-arrest statement on the grounds that it was not the product of custodial interrogation because it was not responsive to a question posed by the detective. Rather, Mr. Nelson volunteered the statement on his own after the detective told him what was found in the apartment. On this basis, the detective's testimony regarding Mr. Nelson's statement was admitted into evidence at trial. During closing arguments, the prosecutor also referred to Mr. Nelson's statement as an acknowledgment of his guilt.

Mr. Nelson's objections to the prosecutor's use of this statement at trial raise two central questions: (1) whether the statement itself was subject to the exclusionary rule and therefore inadmissible under *Miranda*, and (2) whether the prosecutor's use of the statement at trial ran afoul of the rule against commenting on a defendant's silence

- 13 -

articulated in *Griffin v. California*, 380 U.S. 609 (1965), and its progeny. We first address the admissibility of the statement itself before turning to the propriety of the prosecutor's comment on it.

Our Supreme Court has recognized "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." *Dickerson v. United States*, 530 U.S. 428, 433 (2000). The due-process inquiry "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). In this case, Mr. Nelson does not contend that his statement was involuntary or coerced under a due-process standard.

Instead, he bases his challenge to the admissibility of his post-arrest statement on the Fifth Amendment and *Miranda*. The Fifth Amendment inquiry applies to "the admissibility in evidence of any statement given during custodial interrogation of a suspect" and depends on "whether the police provided the suspect with [the] four warnings" that *Miranda* requires. *See Dickerson*, 530 U.S. at 435. For purposes of this inquiry, the government generally bears the burden of proving that a defendant's waiver of his or her *Miranda* rights was knowing and voluntary. *See United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997). But "[a]n express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words." *Id.*

- 14 -

In this case, Mr. Nelson challenges the district court's finding that his post-arrest statement was not responsive to a custodial interrogation. He cites *United States v. Rambo*, 365 F.3d 906, 909-10 (10th Cir. 2004), for the proposition that a conversation can amount to "interrogation" for purposes of *Miranda* even when the officer does not ask questions. *Rambo* in turn recognizes the Supreme Court's holding in *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), that "interrogation encompasses not only questioning but 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Rambo*, 365 F.3d at 909 (quoting *Innis*, 446 U.S. at 301) (footnote omitted).

The facts of this case are distinguishable from *Rambo* in several respects. First, the officer involved in the conversation with Mr. Rambo repeatedly made statements positing his guilt that were not provoked by Mr. Rambo but were intended to provoke a response from him. *See id.* In contrast, the detective's statement to Mr. Nelson was provoked by Mr. Nelson's own question about what was found in the apartment. In this context, the detective's statement cannot be reasonably understood as an effort to provoke an incriminating response from Mr. Nelson.

This case also is distinguishable from *Rambo* because there the officer continued his conversation with Mr. Rambo and kept provoking an incriminating response even after Mr. Rambo answered "no" to the question: "[D]o you want to talk to me about this stuff?" *Id.* at 910. In contrast, Mr. Nelson never gave such a direct answer to the

detective's question about whether he wanted to waive his *Miranda* rights. Instead, his response was to ask the detective what was found in the apartment, and when the officer told him, he stated: "*I guess I'm ready to go to jail then.*" The detective discontinued the interview at that point. For these reasons, the district court correctly determined that Mr. Nelson's statement was not in response to an interrogation by the detective, and the requirements of *Miranda* do not apply to this statement.

In the alternative, we note that the detective completed the task of giving the four warnings required under *Miranda* before Mr. Nelson made his statement, and Mr. Nelson never actually invoked his right to remain silent before making that statement. Thus, even if Mr. Nelson's statement was taken in the course of a custodial interrogation, the detective's conduct did not violate the dictates of *Miranda*.

On appeal, Mr. Nelson tries to avoid this result by asserting that his statement was itself an invocation of his *Miranda* rights. In other words, Mr. Nelson contends that by saying, "*I guess I'm ready to go to jail then*," he was in effect saying that he wished to remain silent.

This argument is foreclosed by the Supreme Court's reasoning in *Davis v. United States*, 512 U.S. 452 (1994). *Davis* specifically addressed the component of the *Miranda* warnings that involves the right to counsel rather than the right to remain silent. "Nonetheless, every circuit that has addressed the issue squarely has concluded that *Davis* applies to both components of Miranda: the right to counsel and the right to remain

silent." *Bui v. DiPaolo*, 170 F.3d 232, 239 (1st Cir. 1999) (collecting cases). As applied to the facts of this case, we agree with this reasoning.

*Davis* held that custodial interrogation may continue unless and until the suspect *actually invokes* his right to counsel; ambiguous or equivocal statements that *might* be construed as invoking the right to counsel do not require the police to discontinue their questioning. *Davis*, 512 U.S. at 458-59; *accord Valdez v. Ward*, 219 F.3d 1222, 1232 (10th Cir. 2000). Determining whether a suspect has invoked his right to counsel "is an objective inquiry." *Davis*, 512 U.S. at 459. The question is whether the suspect's statement is "sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

We employ the same objective inquiry to determine whether Mr. Nelson invoked his right to remain silent in this case. From an objective standpoint, "*I guess I'm ready to go to jail then*" is at best an ambiguous or equivocal statement that *might* be construed as an indication of a desire to discontinue a police interview. This statement is not sufficiently clear that a reasonable police officer in the circumstances would understand it to be an invocation of a *Miranda* right. *Davis* does not require officers to ask clarifying questions in response to an equivocal or ambiguous statement, and the subjective views of the detective as to what Mr. Nelson meant by his statement are not dispositive. On the facts of this case, we conclude that the statement in question was not clear enough to actually invoke Mr. Nelson's *Miranda* rights, and therefore *Miranda* provides no basis for suppressing it under the exclusionary rule.

Regardless of the admissibility of Mr. Nelson's post-arrest statement, however, the question whether the prosecutor improperly commented on Mr. Nelson's exercise of his right to remain silent requires additional analysis. "The general rule of law is that once a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised." *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991); *accord United States v. Lauder*, 409 F.3d 1254, 1261 (10th Cir. 2005). This rule follows from the Supreme Court's reasoning in *Griffin*, 380 U.S. at 615, where the issue was whether the law allowed the prosecutor to comment on a defendant's failure to testify at trial. The rule is the same, however, regardless of whether the issue is "prosecutorial comment on the failure of a defendant to testify" or "comment on his pre-trial silence." *United States v. Bennett*, 542 F.2d 63, 64 (10th Cir. 1976). In either case, the target of the prosecutor's comment is not "what the defendant said; rather, it was what he did not say." *Burson*, 952 F.2d at 1200.

In this case, the focus of the prosecutor's comment is on the detective's trial testimony about what Mr. Nelson said to him while he was under arrest at the police station, *i.e.*, the statement that: "*I guess I'm ready to go to jail then.*" The prosecutor argued that this statement was an "acquiescence" or "an acknowledgment by the defendant that he's guilty" of the crimes charged in the indictment.

Mr. Nelson asserts that it was improper for the prosecutor to comment on this statement because, as noted above, he construes the statement as an invocation of his Fifth Amendment right to remain silent. While the preceding analysis rejects Mr.

Nelson's contention that a police officer at the police station would have reasonably understood *the statement itself* as an invocation of his *Miranda* rights, additional analysis is required to determine whether the jury at trial would have understood *the prosecutor's reference to the statement* as a comment on Mr. Nelson's silence.

The latter determination depends on "'whether the language used [by the prosecutor] was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Barton*, 731 F.2d 669, 674 (10th Cir. 1984) (quoting *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir.1955)); *accord United States v. Rahseparian*, 231 F.3d 1267, 1273 (10th Cir. 2000). "'The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so.'" *United States v. Garcia*, 13 F.3d 1464, 1474 (11th Cir. 1994) (quoting *United States v. Swindall*, 971 F.2d 1531, 1552 (11th Cir.1992)). "Furthermore, '[m]anifest intent will not be found if some other explanation for the prosecutor's remark is equally plausible.'" *United States v. Jefferson*, 925 F.2d 1242, 1257 (10th Cir. 1991) (quoting *United States v. Mora*, 845 F.2d 233, 235 (10th Cir. 1988)).

We have applied this test to fact patterns which are analogous to the case at bar. In *Bennett*, 542 F.2d at 64, an officer testified at trial that upon the defendant's arrival at a cubicle where his property was searched and found to contain contraband, the defendant "'had a real surprised look on his face,' and said, 'Oh, hell!'" The prosecutor also mentioned this testimony during his closing argument, noting that "[w]hen the search was

conducted, [the defendant] says, 'Oh, hell!' The [d]efendant didn't say, 'Oh, my gosh! How did those get there?'" *Id.* On these facts, we held that the prosecutor's comments were permissible, reasoning that the defendant "could have remained entirely silent, in which case comment on that fact by the prosecutor would not have been proper. He chose to express himself, however, and testimony as to what he did say was in evidence. As such it was a fair subject for comment by the prosecutor." *Id.*

We addressed a similar situation in *United States v. Espinosa*, 771 F.2d 1382 (10th Cir. 1985), where the defendant "did not remain totally silent when arrested, and testimony as to what he did say was in evidence. The prosecutor could therefore fairly comment on this evidence in closing argument. His remarks were not of such a character that the jury would necessarily consider them to be statements about [a defendant's] failure to testify . . . ." *Id.* at 1402. *Bennett* and *Espinosa* are analogous to the present case because here the prosecutor was construing Mr. Nelson's words as an admission of his guilt, rather than trying to draw the inference that he must be guilty because he failed to speak or because he invoked a constitutional right. Thus, we conclude that the prosecutor's comment on the evidence was not improper.

III.

Mr. Nelson's third and final issue on appeal is whether the district court erred by not conducting an evidentiary hearing pursuant to *Franks*, 438 U.S. at 171-72, to evaluate the validity of the search warrant for his apartment that the officers executed shortly after

he was arrested. Mr. Nelson raised this issue in the district court by way of a pretrial motion to suppress the evidence found during the warrant's execution.

In order to be entitled to an evidentiary hearing under *Franks*, "the defendant must allege deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *United States v. Artez*, 389 F.3d 1106, 1116 (10th Cir. 2004). To support such allegations, a defendant should provide affidavits of witnesses or satisfactorily explain their absence. *See id.* In addition, a defendant seeking an evidentiary hearing must show that, after the challenged portions of the affidavit are stricken, the remaining content of the affidavit is not sufficient to support a finding of probable cause. *See id.*

In this case, the search warrant that Mr. Nelson seeks to challenge had been issued by a state court judge and was supported by an affidavit from a police detective that recounted how confidential informants made controlled drug purchases from his residence while under police surveillance. The police recorded these controlled transactions on audiotapes which were later introduced at trial.

The district court found that no *Franks* hearing was warranted and denied Mr. Nelson's motion to suppress. On appeal, Mr. Nelson challenges this ruling on the grounds that the search-warrant affidavit recklessly omitted significant information about one of the confidential informants that undermined his credibility or veracity, namely that (1) he had a past felony conviction, (2) he was buying and using drugs during the period when the controlled buys from the residence occurred; (3) he had been classified as

disabled for more than 20 years based on a mental illness; (4) he may have had a personal bias against the Mr. Nelson based on Mr. Nelson's alleged former relationship with the informant's sister.

We conclude that such information does not warrant a *Franks* hearing in this instance because "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). More specifically,

> [a] tip from an anonymous or confidential informant that narcotics are being distributed at a particular location may be corroborated through the arrangement of a controlled purchase at the suspect location. The common formalities observed by police officers when conducting such controlled purchases are as follows: the police search the informant (and his vehicle, if appropriate) for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant.

*Artez*, 389 F.3d at 1111-12 (footnote omitted). So long as these common formalities are observed to a substantial degree, the corroborative value of such a controlled purchase is not significantly diminished by the type of background facts alleged here regarding the informant's veracity or credibility (such as the informant's criminal record, drug use, or history of mental illness). *See id.* at 1112; *Danhauer*, 229 F.3d at 1006.

Given the level of independent corroboration provided by the police surveillance of the confidential informant's controlled buys in this case, the addition of negative

information about the confidential informant's credibility or veracity would not change the outcome because it does nothing to defeat a showing of probable cause. Consequently, no valid purpose is served by holding a *Franks* hearing to delve into such negative information about the informant's background in this context, and the district court did not err by declining to hold such a hearing.

IV.

For the foregoing reasons, we conclude that the district court applied the correct analytical framework for addressing Mr. Nelson's *Batson* challenge and did not clearly err in finding that the prosecutor had a credible and persuasive race-neutral justification for using a peremptory strike to keep an African American college professor from serving on the jury. We also conclude that Mr. Nelson has not shown reversible error in the district court's admission of the evidence seized from his residence pursuant to a search warrant or the evidence and argument relating to the post-arrest statement he made upon being informed of that seizure. Accordingly, the judgment of the district court is AFFIRMED.