**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 2, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.                                                                              No. 23-3170

MAURICE WILLIAMS,

    Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:08-CR-20137-JWL-1)**

_____

Kayla Gassmann, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender with her on the briefs), Kansas City, Kansas for Defendant-Appellant.

James A. Brown, Appellate Chief, United States Attorney's Office for the District of Kansas (Kate E. Brubacher, United States Attorney with him on the brief), Topeka, Kansas for Plaintiff-Appellee.

_____

Before **HARTZ**, **EID**, and **CARSON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

The supervised release of Defendant Maurice Williams was revoked after a hearing in which the government presented evidence that he sold fentanyl to a confidential informant (CI) during a controlled buy. On appeal he argues that (1) the

district court erred by admitting evidence of the controlled buy without conducting an interest-of-justice balancing test under Federal Rule of Criminal Procedure 32.1(b)(2)(C) to determine whether the CI should have been required to be available for cross-examination at the hearing, and (2) the evidence was insufficient to show that he sold fentanyl. We affirm. No balancing test was required because the court did not rely on any hearsay statements by the CI. And the evidence was sufficient to establish guilt by a preponderance of the evidence even though no police officer searched the undergarments of the CI before the controlled buy.

## I.    BACKGROUND

In January 2009 Mr. Williams pleaded guilty to charges of distributing crack cocaine and unlawful possession of a firearm. The district court sentenced him to 84 months' imprisonment followed by eight years of supervised release.

Mr. Williams began serving his supervised release in 2015, but his supervised release was revoked in 2020 because he violated his conditions of release by committing another crime, possessing controlled substances, possessing a firearm and ammunition, and leaving the district without permission. He was sentenced to an additional 18 months' imprisonment, followed by two years of supervised release. In January 2022 Mr. Williams again entered supervised release.

In March 2023 United States Probation Officer Olivia Cates recommended that Mr. Williams's supervised release be revoked because he had violated the conditions of his release by unlawfully possessing a controlled substance, committing another

crime, and owning, possessing, or having access to a firearm. In support of the charges she alleged that on February 20, 2023, Mr. Williams sold fentanyl to a confidential informant in a controlled buy and possessed a firearm while doing so. She further alleged that on February 24, 2023, officers searched a residence where Mr. Williams apparently had his own room and found a firearm, ammunition, and fentanyl.

The United States District Court for the District of Kansas held a revocation hearing at which the government introduced evidence of the controlled buy, including testimony from Kansas City Police Officers Mark Palmerin and Kyle McAvoy and a video of the controlled buy.

Officer Palmerin testified that the buy was arranged after the "CI advised that they could purchase powder Fentanyl from a subject who goes by Reece." R., Vol. III at 35. When he searched the CI before the buy, he did not find any contraband. Because the CI was female, however, he did not check inside her clothing, bra, or underwear. Officer McAvoy testified that the department's "preferred method" is for a *female* to conduct a search of a female CI given "how intrusive the search can be." *Id.* at 30. But Officer Palmerin testified that the search was "more than pat-down," *id.* at 51, and that "I checked her pockets, I checked her legs, and then I usually like to have them just shake out, do like a shake of their chest area to see if anything falls out or anything, and none of that occurred," *id.* at 36. He also provided the CI with $200 to make the buy. The bills were "marked" so that they could be traced, but

Officer McAvoy testified that he was unsure if the marked bills were ever recovered. *Id.* at 32.

Officer McAvoy drove the CI to make the purchase. He testified that when the CI was with him, "the CI called the target [whom he later identified as Mr. Williams], and the target said that they would meet them" at a strip mall in Kansas City, Kansas. *Id.* at 21–22. He was able to hear what Mr. Williams said over the phone because the CI used her telephone's speakerphone mode. When they arrived at that location, the CI exited the vehicle and entered Mr. Williams's vehicle (a silver Infiniti SUV), which was about four parking stalls north of where Officer McAvoy's vehicle was parked. When the CI returned to Officer McAvoy's vehicle, she handed him the suspected fentanyl in an approximately one-inch-by-one-inch clear plastic bag. A police-laboratory test later confirmed that the substance was two grams of fentanyl. The CI also told Officer McAvoy that Mr. Williams had a gun.

During the buy Officer Palmerin and other officers conducted surveillance from an unmarked vehicle in the area. Although Officer Palmerin testified that officers normally have the capability to listen during a controlled buy, he did not recall if that capability was used for this specific buy.

The government also introduced a video (with sound) of the controlled buy. The camera was attached to the CI's body. It shows Officer McAvoy driving to the

strip mall with the CI sitting next to him in the vehicle.[1] Although the CI is not visible in the video, she can be heard, just before the departure to the strip mall, talking on speaker with a man and saying that she would meet him in "five minutes." Gov't Ex. 1 at 0:00–00:12. After they arrive at their destination, Officer McAvoy parks the vehicle, and he and the CI wait in it until the CI answers a call on speaker from a man who says, "I'm here." *Id.* at 8:06–8:15. The CI exits the vehicle and enters Mr. Williams's vehicle (a silver SUV). The CI and Mr. Williams converse. At one point the CI asks if she can send her friend Daniel to Mr. Williams, and Mr. Williams agrees. While discussing Daniel, the CI mentions "2G's" and Mr. Williams acknowledges "2G's." *Id.* at 10:20–10:22. Mr. Williams asks, "What you give him? A hundred a G?" *Id.* at 10:23. The CI replies, "Two hundred." *Id.* at 10:26. Mr. Williams asks, "So if he come to me, what I tell him? Two hundred?" *Id.* at 10:27–10:29. The CI says, "Yeah," and Mr. Williams says, "All right." *Id.* at 10:29–10:31. The video, which does not capture all of Mr. Williams's person, does not show drugs or money exchanging hands between the CI and Mr. Williams. During their interaction an object that Officer McAvoy identified as a lower assembly to a pistol is momentarily visible in Mr. Williams's lap. The CI then returns to Officer McAvoy's

---

[1] Officer McAvoy, the CI, and Mr. Williams do not identify themselves in the video. But Mr. Williams does not dispute that the driver is Officer McAvoy, the passenger is the CI, and the person with whom the CI interacts after leaving Officer McAvoy's vehicle is Mr. Williams. *See* Aplt. Br. at 8 (in the video, "the informant leaves Officer McAvoy's car, gets into an Infiniti, has an interaction with Mr. Williams, then returns . . . .").

vehicle and tells him that Mr. Williams had a gun. The video does not show the CI making any significant movements while she is in Mr. Williams's vehicle and out of sight of Officer McAvoy. She spends 88 seconds in the silver Infiniti. For all but a total of 18 seconds spread over eight occasions (the longest being eight seconds), the camera appears to be completely steady, and when it is not completely steady, the movement is slight (other than the two seconds when she appears to be getting seated in the vehicle and two seconds when she is leaving it).

Probation Officer Cates testified that Mr. Williams's approved residence during supervised release was on North 28th Street. But four days after the controlled buy, officers executed a search warrant for a residence on North Bethany Street. They searched that residence because the police had previously connected Mr. Williams with that address and Officer Palmerin had conducted spot checks there "pretty early in the morning" between the day of the controlled buy and the execution of the warrant and the silver Infiniti had been parked there. R., Vol. III at 39–40. Officers found in an upstairs loft a Federal Bureau of Prisons ("BOP") identification card in Mr. Williams's name, keys to an Infiniti, and photographs that appeared to be of Mr. Williams. They also found a firearm, ammunition, fentanyl, and sandwich baggies in the loft.

At the revocation hearing, when the government moved to admit the video, Mr. Williams's counsel expressed a "continuing objection about the lack of presence of the actual confidential informant." *Id.* at 26. Counsel argued that "there are

Page **6**

statements on [the video] that come from the CI," but "she is not physically present today." *Id.* The district court said that it would not consider the statements made by the CI on the video "for the truth, but rather for simply what led to whatever statement is made by the person who is alleged to be Mr. Williams." *Id.* at 28.

The district court found that Mr. Williams sold fentanyl and therefore committed a Grade A violation but did not find a violation related to the firearm. The court revoked his term of supervised release and sentenced him to 24 months' imprisonment.

## II.    FED. R. CRIM. P. 32.1(b)(2)(C)

"We review the district court's decision to revoke supervised release for abuse of discretion. Legal questions relating to the revocation of supervised release are reviewed *de novo*." *United States v. Jones*, 818 F.3d 1091, 1097 (10th Cir. 2016) (internal quotation marks omitted).

Mr. Williams argues that the district court erred by revoking his supervised release "based on the evidence of the alleged undercover buy which was initiated and conducted by the informant, including a video recording made by the informant, and hearsay statements from the informant, without the informant being made available for questioning, and without conducting the interest-of-justice balancing test before excusing the government from producing her." Aplt. Br. at 20.

On appeal Mr. Williams relies on Federal Rule of Criminal Procedure 32.1(b)(2)(C),[2] which provides that a defendant in a revocation hearing "is entitled to . . . an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." We have noted that Rule 32.1 "codified due process guarantees that apply to revocation hearings." *Jones*, 818 F.3d at 1099 (brackets and internal quotation marks omitted). These rights were recognized by the Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471, 472 (1972), in which it considered the extent of due-process protections for parolees facing revocation of their parole. The Court began "with the proposition that the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." *Id.* at 480. It explained: "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." *Id.* Nevertheless, the Court held that parolees must be afforded some procedural rights. *See id.* at 484. These rights extend to releasees facing revocation of supervised release. *See Jones*, 818 F.3d at 1098.

---

[2] Mr. Williams did not cite the rule in district court, and the government argues that Mr. Williams's continuing objection to the "lack of presence of the actual confidential informant" was not preserved because it was "too vague, non-specific, and indefinite to alert the district court [to] the precise legal ground for his complaint." Aplee. Br. at 22 (internal quotation marks omitted). The government also argues that any error was harmless. Because we conclude that the district court did not err, we need not address these arguments.

In particular, the "minimum requirements of due process" that must be afforded include "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Morrissey*, 408 U.S. at 489. The Supreme Court implicitly defined what an adverse witness is when it recognized a similar right that must be afforded at a preliminary revocation hearing. It said, "On request of the parolee, [a] *person who has given adverse information on which parole revocation is to be based* is to be made available for questioning in his presence." *Id.* at 487 (emphasis added). This right to confront is not coextensive with the Sixth Amendment right to confrontation, because revocation hearings are not criminal prosecutions. *See Jones,* 818 F.3d at 1102. At revocation hearings courts have the flexibility to "consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Morrissey*, 408 U.S. at 489.

The extent of that flexibility is the purview of Rule 32.1(b)(2)(C), which we have said codified *Morrissey* for revocation of supervised release. *See Jones*, 818 F.3d at 1099. The releasee has the right to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). We assume that the Rule uses the term *adverse witness* in the same sense as *Morrissey*. *See* 408 U.S. at 487; *cf.* 28 C.F.R. § 2.50(c) (At a revocation hearing before the United States Parole Commission, "the Commission may on the request of the alleged violator or on its own motion, request

Page **9**

the attendance *of persons who have given statements upon which revocation may be based*." (emphasis added)). That is, the term refers to a person who has made a statement the truth of which is used by the government to establish guilt. In the parlance of the rules of evidence, an adverse witness under Rule 32.1(b)(2)(C) is a declarant of hearsay (that is, an out-of-court statement offered for the truth of the matter asserted) used to establish violation of a condition of release. The function of the Rule, then, is to direct the district court regarding when to consider requiring the declarant to appear at the revocation hearing. *See Jones*, 818 F.3d at 1098 (Rule 32.1(b)(2)(C) "governs whether hearsay evidence may be used to revoke supervised release."). Our reading of Rule 32.1(b)(2)(C)—that the term *adverse witness* refers to a hearsay declarant—appears to be the general reading of the term in federal court. *See, e.g., United States v. Teixeira*, 62 F.4th 10, 21 (1st Cir. 2023) (referring to evidence by adverse witness as "the hearsay evidence"); *United States v. Falls*, 960 F.3d 442, 445 (7th Cir. 2020) (Rule 32.1(b)(2)(C) did not apply to statements that were "non-hearsay" or "offered . . . not for their truth.").

This court, together with every other circuit court, *see Jones*, 818 F.3d at 1099, has held that whether the "interest of justice does not require the witness to appear," Rule 32.1(b)(2)(C), is to be evaluated "by balancing (1) the person's interests in the constitutionally guaranteed right to confrontation against (2) the government's good cause for denying it," *Jones*, 818 F.3d at 1100 (internal quotation marks omitted). But it follows from the above that the balancing test is to be applied only to hearsay

evidence. Rule 32.1(b)(2)(C) has no function to perform if the evidence emanating from an absent witness is not hearsay. (We need not address whether the Rule applies to hearsay admissible under an exception to the hearsay rule, because no exception was invoked here. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) (hearsay evidence that comes within an exception to the hearsay rule may still be barred by the Confrontation Clause).) It is also worth noting that the Rule does not bar the admission of hearsay at a revocation hearing so long as the declarant is available at the hearing for questioning by the releasee; after all, the Rule speaks in terms of requiring the witness (the declarant) to appear at the revocation hearing, not in terms of excluding the hearsay evidence. *See United States v. Henry*, 852 F.3d 1204, 1207 (10th Cir. 2017) (Gorsuch, J.) (district court was not required to conduct a Rule 32.1(b)(2)(C) balancing test before admitting hearsay statements of a declarant who appeared at the hearing and was available for cross-examination).

Mr. Williams contends that Rule 32.1(b)(2)(C) protects his right to question the CI "[w]hether or not [the] evidence qualifies as hearsay." Aplt. Br. at 21–22. But he cites no case authority in support of that assertion, and we know of none. The cases he cites all involved hearsay. *See United States v. Ferguson*, 752 F.3d 613, 617 (4th Cir. 2014) (laboratory report); *United States v. Doswell*, 670 F.3d 526, 528 (4th Cir. 2012) (statement by police officer and drug analysis report); *United States v. Perez*, 526 F.3d 543, 546 (9th Cir. 2008) (urinalysis report).

Thus, the district court was not required to conduct a Rule 32.1(b)(2)(C) balancing test because it did not consider any hearsay evidence. The only "hearsay" objection posed by Mr. Williams at the hearing concerned statements on the video by the CI. And the court responded by stating that it would not consider her statements "for the truth, but rather for simply what led to whatever statement is made by the person who is alleged to be Mr. Williams." R., Vol. III at 28. Mr. Williams does not (and could not legitimately) argue that the CI's statements were admitted for a hearsay purpose if the court used them only as it said it would. *See United States v. Smalls*, 605 F.3d 765, 785 n.18 (10th Cir. 2010) ("CI's questions and comments do not constitute hearsay within Fed.R.Evid. 801's definition because they are not offered to prove the truth of the matter asserted, but rather are offered to establish their effect on [the defendant's co-conspirator] and provide context for his statement."); *United States v. Murry*, 31 F.4th 1274, 1292 (10th Cir. 2022) ("We have long held that a statement offered to establish its effect on the listener is not hearsay."). And Mr. Williams provides no reason for us to believe that the court did not keep its commitment. Indeed, the only statement by the CI that probably could not be used for a nonhearsay purpose was her statement that Mr. Williams had a gun. But the court clearly did not use that statement against Mr. Williams, because it did not rule against him on the charge of possession of a firearm. We therefore reject Mr. Williams's argument that the district court erred by not conducting a Rule 32.1(b)(2)(C) balancing test.

### III.    SUFFICIENCY OF THE EVIDENCE

Mr. Williams also argues that the government failed to meet its burden of proving that he distributed fentanyl. To revoke supervised release, the district court must find a violation of the defendant's conditions of supervised release by a preponderance of the evidence. *See* 18 U.S.C. § 3583(e)(3). As is generally true for fact findings by the district court, we view the evidence in the light most favorable to the ruling on revocation. *See, e.g.*, *United States v. Frederickson*, 988 F.3d 76, 80 (1st Cir. 2021) ("We recount the facts as presented at [the defendant]'s revocation hearing in the light most favorable to the government, except where presenting conflicting testimony is necessary to understand the legal issues in this appeal." (citation omitted)); *United States v. King*, 608 F.3d 1122, 1129 (9th Cir. 2010) ("On a sufficiency-of-the-evidence challenge to a supervised release revocation, we ask whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of a violation by a preponderance of the evidence." (internal quotation marks omitted)); *United States v. Alaniz-Alaniz*, 38 F.3d 788, 792 (5th Cir. 1994) ("In considering [the defendant]'s challenge to the sufficiency of the evidence [at a revocation hearing], this Court must view the evidence and all reasonable inferences that may be drawn from the evidence in a light most favorable to the government." (internal quotation marks omitted)); *United States v. Hossack*, 75 Fed. App'x. 721, 722 (10th Cir. 2003) (same); *cf.* 2 Steven Alan Childress & Martha S. Davis, *Federal Standards of Review* § 10.02, at

10-6 (4th ed. 2010) (In sufficiency-of-the-evidence review after a nonjury trial, "[t]he reviewing court is supposed to review the judge's general finding as to guilt with the same deference accorded a jury determination of guilt—that is, substantial evidence or reasonableness review.")

The evidence presented at the hearing was sufficient to find by a preponderance of the evidence that Mr. Williams sold fentanyl to the CI. The video and testimony establish that Officer Palmerin searched the CI without finding any contraband and gave her $200, Officer McAvoy drove her to a strip mall to meet with Mr. Williams, and the CI entered Mr. Williams's vehicle and returned with a bag of fentanyl.

Other evidence also indicated Mr. Williams's ties to drug dealing and fentanyl. The video captured the CI asking if she could send her friend Daniel to Mr. Williams and Mr. Williams agreeing, mentioning "2G's," asking about the price, and agreeing on "A hundred a G" (or "Two hundred"). (The CI was given $200 by the officers, and she returned with two grams of fentanyl.) In addition, officers found fentanyl and sandwich baggies in a loft where they also found Mr. Williams's BOP identification card, photographs that appeared to be of him, and keys to an Infiniti (the make of car Mr. Williams was in during the controlled buy). Although the loft was not in the residence approved for Mr. Williams by his probation officer, Officer Palmerin had observed the Infiniti outside the residence during spot checks conducted early in the

morning between the date of the controlled buy and the date of the search, suggesting that Mr. Williams may have been spending the night there.

Mr. Williams argues that the district court "incorrectly discounted the significance of the officers' failure to fully search the informant prior to the alleged buy." Aplt. Br. at 35. To be sure, it appears to be common practice for officers conducting controlled buys to search the confidential informant more intrusively than occurred here. Mr. Williams cites *United States v. Avery*, 295 F.3d 1158, 1165 (10th Cir. 2002), *abrogated on other grounds by United States v. O'Brien*, 560 U.S. 218, 235 (2010), in which a CI was strip searched before a controlled buy, and other cases mentioning that a CI was searched without giving details about how intrusive the search was. And Officer McAvoy testified that his department's "preferred" method would have been to have the CI searched by a female officer who could be more "intrusive." R., Vol. III at 30. Yet Mr. Williams has not cited, nor are we aware of, any court decisions requiring such an intrusive search to prove guilt beyond a reasonable doubt, much less guilt by a preponderance of the evidence. The closest he comes is citing *United States v. Joseph*, No. 3:15-CR-7-CRS, 2015 WL 4531306, at *11–12 (W.D. Ky. July 27, 2015), which declined to credit evidence from purportedly controlled purchases. In that case, however, there was essentially no information regarding how the purchases were controlled—no allegation that the informant was searched at all, no evidence that the money used was marked, and no evidence that the substance obtained was in fact an unlawful drug, etc. *See id.*

To the extent that this court has said anything on the subject, our comments do not support Mr. Williams. In the context of determining whether the district court must hold an evidentiary hearing to evaluate the veracity of a search warrant, we said that the corroborative value of a controlled buy is not "significantly diminished" by facts undercutting the CI's credibility (like criminal record, drug use, or mental illness), so long as the "common formalities are observed to a substantial degree." *United States v. Nelson*, 450 F.3d 1201, 1214 (10th Cir. 2006). Those common formalities are:

> [T]he police search the informant (and his vehicle, if appropriate) for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant.

*Id*. (quoting *United States v. Artez*, 389 F.3d 1106, 1111–12 (10th Cir. 2004)). Particularly since *Artez* did not describe the type of search of the informant to be conducted, the officers in this case at least substantially complied with these formalities. Indeed, one of the cases cited by *Artez* in support of its description of the common formalities of a controlled buy was *United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998), where the court rejected the defendant's argument that controlled buys did not support probable cause for the issuance of a warrant because "police did not supervise the informant adequately during the buys." It said that

Page **16**

"[w]hile police did not conduct a full search of the informant before the buys, they did pat him down before and after" the controlled buys. *Id.*

Further, other courts have held that there was sufficient evidence to support a conviction beyond a reasonable doubt, a stricter standard than necessary for revocation of supervised release, despite the absence of an intrusive search. *See United States v. Stevenson*, 680 F.3d 854, 857 (7th Cir. 2012) (officers searched the CI but "did not check thoroughly [the CI]'s undergarments or conduct a pat-down search"); *People v. Frank*, 201 N.E. 2d 197, 199 (Ill. Ct. App. 1964) ("The police searched his shoes and socks, went through his pockets and cuffs and searched his hat and tie. While the police did not search the informer's collar or underwear, the thoroughness of the search only goes to the weight to be given the testimony of the witnesses and is primarily the responsibility of the trier of fact."); *Reynolds v. Commonwealth*, No. 0508-22-3, 2023 WL 4565879, at *1–2 & n.7 (Va. Ct. App. July 18, 2023) (officer did not search the confidential informants' underwear before controlled buy); *Bussey v. State*, No. 14-10-00685-CR, 2012 WL 626316, at *8–9 (Tex. Ct. App. Feb. 28, 2012) (detectives failed to search inside the CI's "shoes and underwear" but the recordings of the controlled buys failed "to indicate that the CI obtained controlled substances from his shoes, his underwear, or any source other than the appellant"); *State v. McGowan*, No. 09 JE 24, 2010 WL 1204273, at *4 (Ohio. Ct. App. Mar. 26, 2010) (officer searched the CI's "outer clothing, shoes and socks, but did not search her underwear"); *Baird v. State*, No. CACR 02-1251, 2003

Page **17**

WL 21278280, at *1 (Ark. Ct. App. June 4, 2003) (CI's "underwear and socks were never searched"); *see also United States v. Rigaud*, 724 F. Supp. 2d 223, 230 (D. Mass. 2010) ("Because courts have declined to require underwear and body cavity searches in controlled buys . . . a magistrate judge surely would not have found the affidavit [for a search warrant] fatally defective for explicitly acknowledging a failure to do what the law does not require.")

The particulars of this buy also support the district court's finding. Officer Palmerin testified that he conducted a search that was "more than pat-down," including checking the CI's pockets and legs and having her shake out her chest area. R., Vol. III at 51. And it is hard to see how the CI could have removed a packet of drugs from her underwear during the interval between her departure from Officer McAvoy's vehicle and her return to him. She was in full view of Officer McAvoy and perhaps the officers watching from another vehicle during her transit to and from Mr. Williams's Infiniti, and she was in that vehicle for only 88 seconds, during which time she was talking with Mr. Williams while her body was essentially motionless for all but 18 seconds and moved very little on eight occasions during those 18 seconds other than presumably to get in and out of her seat. Other evidence outlined above also indicated, or at least corroborated, that the transaction with the CI was a sale of fentanyl.

We conclude that there was ample evidence to support the findings by the district court. As in every criminal prosecution, the government did not present

evidence that might have further strengthened its case, such as evidence of the CI's reliability, fingerprints on the plastic baggie, or a video of the transaction from a camera controlled by the officers. The absence of such evidence can certainly be raised by defense counsel in closing argument. But we have never required the prosecution to present a perfect case. Reasonable people can make reasonable findings by the preponderance of the evidence despite our living in an imperfect world.

Finally, Mr. Williams argues that the district court improperly shifted the burden of persuasion by requiring him to show that the CI possessed fentanyl before the controlled buy. We disagree. The district court said:

> In the absence of any evidence that would cause me to think that wasn't Fentanyl that Mr. Williams sold to the CI, rather than something that the CI had secreted away someplace, I think it is speculation to believe that she might have had something in her bra or her pants or some other such place when there's simply no indication of that, other than the theoretical possibility that that could have occurred.

R., Vol. III at 66–67. But it did not shift the burden of persuasion to Mr. Williams. The court simply inferred that Mr. Williams sold fentanyl to the CI from the officers' testimony and the video "of Mr. Williams in a -- shall we say a mysterious setting with the CI. We then have the CI presenting the Fentanyl to the officer." *Id.* at 66. It did no more than use the absence of evidence that the CI hid fentanyl in some place that officers did not search to refute an alternative explanation for how she produced fentanyl after returning from Mr. Williams's vehicle.

## IV.   CONCLUSION

We **AFFIRM** the judgment below. We **DENY** as moot Mr. Williams's motion to expedite this appeal.