PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff - Appellee

v.

CAMERON TAEVON JONES,

    Defendant - Appellant.

Nos. 15-6119

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:07-CR-00294-F-1)

Kyle Edward Wackenheim, Research and Writing Attorney (Paul Antonio Lacy, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender for the Western District of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellant.

Timothy W. Ogilvie, Assistant United States Attorney (Sanford C. Coats, United States Attorney, with him on the brief), Office of the United States Attorney for the Western District of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellee.

Before **TYMKOVICH**, Chief Judge, **BRISCOE,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

The district court revoked Cameron Jones's supervised release. It relied on hearsay evidence from the Government's only witness at the revocation hearing. On appeal, Mr. Jones argues (1) Federal Rule of Criminal Procedure 32.1(b)(2)(C) requires the district court to apply a balancing test to determine whether hearsay evidence may be considered for revocation, (2) the district court abused its discretion because it did not apply the Rule 32.1(b)(2)(C) balancing test, and (3) this error is reversible. Exercising jurisdiction under 28 U.S.C. § 1291, we agree with Mr. Jones and reverse and remand to the district court for a new revocation hearing.

## I. BACKGROUND

### A. *Factual History*

**1. Mr. Jones's Previous Convictions**

In 1998, Mr. Jones was convicted of interference with commerce by threat or violence, in violation of 18 U.S.C. § 1951, and of using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1). In 2007, he was convicted of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and sentenced to 71 months in prison and five years of supervised release. The court also ordered the prison sentence to run consecutively to the 24-month term of incarceration imposed as a result of the revocation of supervised release in the 1998 case.

The 2007 presentence report stated Mr. Jones was a member of the Rolling 60s Crips gang and goes by the alias C-Rag.

2. **The September 27, 2014 Murder**

On August 29, 2014, Mr. Jones was released from prison and began serving his five-year term of supervised release for the 2007 conviction. On September 27, 2014, Mr. Miles, a Rolling 60s Crips member, was murdered. Two days after the murder, the United States Probation Office filed a petition to revoke Mr. Jones's supervised release, alleging Mr. Jones violated the following conditions: (1) "[t]he defendant shall not commit another federal, state, or local crime;" (2) "[t]he defendant shall not possess a firearm, destructive device, or any other dangerous weapon;" and (3) "[t]he defendant shall not associate with any persons engaged in criminal activity and shall no[t] associate with any person convicted of a felony unless granted permission to do so by the probation officer." ROA, Vol. I at 18-19. The petition asserted Mr. Jones violated these conditions by murdering Mr. Miles, possessing a firearm, and associating with Mr. Miles, a convicted felon.

B. *Procedural History*

1. **The Revocation Hearing**

After the Probation Office filed its petition, the district court held a revocation hearing on April 9, 2015. The Government presented one witness: Inspector Benavides, a homicide detective with the Oklahoma City Police Department who investigated the murder. He testified about Ms. Palmore's and Trenton Nguyen's statements given during witness interviews. He also testified about his investigation of the murder, Mr. Jones's arrest, and Mr. Jones's state murder prosecution. He testified as follows.

-3-

a. *Ms. Palmore's statements*

Inspector Benavides interviewed Ms. Palmore on the day of the shooting. He testified Ms. Palmore claimed to have seen the shooting and that she provided the following information:

- She "had just gotten out of prison."

- Before the murder, she was at a bar named Slick Willie's with a group of people that included Mr. Jones and Mr. Miles.

- At Slick Willie's, Mr. Miles tried to break up a fight between "some females" and, in the process, had a confrontation with Mr. Jones.

- Following the confrontation, she and the rest of the group left Slick Willie's.

- When she arrived at her apartment, a group that included Mr. Jones was located in a nearby parking lot of a Cricket cell phone store.

- Ms. Palmore saw Mr. Miles walk toward the group accompanied by an "Asian boy," who was later identified as Mr. Nguyen.

- Ms. Palmore went inside her apartment, but at some point heard people in the parking lot yelling.

- She went outside and saw Mr. Jones shooting at the car Mr. Miles was sitting in.

- Mr. Jones was "walking up to the car shooting into the car."

- When Mr. Jones arrived at the driver's side window, he shot into the car.

- Mr. Miles was trying to get out of the passenger's side of the car during the shooting.

- An "entire clip" was shot.

-4-

- After the shooting, Mr. Jones got into a two-door white Monte Carlo, which sped away from the scene, and "the bottom of the car kind of hit the asphalt and they drove off."

- "She was 100 percent sure" Mr. Jones was the shooter.

- She had known Mr. Jones since she was 15 years old[1] but had not seen him for many years before the night of the murder because she had recently been released from prison.

ROA, Vol. III at 20-23.

During the interview, Inspector Benavides showed Ms. Palmore a photo lineup consisting of six headshots of different African-American men, including Mr. Jones. Ms. Palmore identified someone other than Mr. Jones as the shooter. Inspector Benavides had the following exchange with Mr. Jones's counsel on cross-examination:

Q. And then when you took her to the police department, you did a very controlled photo identification?

A. Yes, sir.

Q. And she identified the wrong person; isn't that correct?

A. She -- actually, she identified -- for the first time, she identified -- for me, she identified two people out of one lineup. And that's the first time that has ever happened to me. So once she did that, I went back inside with her and I verified with her that we were absolutely talking about Cameron Jones. And she was very adamant, 100 percent sure, that Cameron Jones was the shooter.

Q. Right. But the point I'm trying to make here is she's saying it was

---

[1] On cross-examination, Mr. Jones's counsel asked Inspector Benavides, "You said that Ms. Palmore had known all of these people involved since she was 15. How many years ago was that, approximately?" ROA, Vol. III at 24. Inspector Benavides answered, "I mean, numerous years. She's an older woman now." *Id.*

[Mr. Jones].

A. Yes, sir.

Q. But the picture she identified was not [Mr. Jones].

A. She identified the picture of [Mr. Jones], but she identified him as the person bringing the gun and giving it -- the person that she identified as the shooter was a random guy that I had put in the lineup. And once we looked at it, you know, the similarities to him and to [Mr. Jones], I mean, they're similar. And the photo lineup is there, you can look at it, I've given it to you. That's why I went back in there to reaffirm with her who we were talking about.

ROA, Vol. III at 38-39.

Inspector Benavides testified that, although Ms. Palmore misidentified Mr. Jones during the photo lineup, she was adamant that Mr. Jones was the shooter. According to Inspector Benavides, Ms. Palmore told him "[she] could have been mistaken, [she] hadn't seen him in a while, [she] had just gotten out of prison, but she [was] 100 percent sure that [Mr. Jones] was the shooter." *Id.* at 40.

b. *Mr. Nguyen's statements*

Inspector Benavides testified that Mr. Nguyen provided the following information:

- Mr. Jones and Mr. Miles had a confrontation at Slick Willie's.

- After the confrontation, he and Mr. Miles left Slick Willie's and went to Mr. Miles's house.

- Mr. Miles said he was going to fight Mr. Jones because Mr. Jones was responsible for the altercation at Slick Willie's.

-6-

- Mr. Nguyen and Mr. Miles went to the Cricket parking lot and Mr. Miles "start[ed] calling [Mr. Jones] out in front of everybody."

- Mr. Jones was on the phone when Mr. Miles was "calling him out" and did not respond to Mr. Miles's provocations. Mr. Jones "decided he wasn't going to fight."

- Mr. Nguyen and Mr. Miles walked back to Mr. Miles's house.

- Mr. Nguyen was not present when Mr. Miles went back to the Cricket parking lot and was shot.

*Id.* at 24-25.

c. *Additional investigation*

Inspector Benavides testified further about his investigation of the shooting. When he arrived at the Cricket parking lot, he was briefed by the law enforcement personnel already on the scene. Mr. Miles's body was "in the parking lot on the passenger side [of the car]." *Id.* at 13. The body was outside the car on the ground because first responders had attempted to administer medical treatment. There were 11 shell casings on the ground on the driver's side of the car. The bullet holes in the car "were from the back to the front, indicating . . . the [shooter] was walking up when the shots were fired." *Id.* at 15.

Two additional shell casings were found inside the car on the driver's seat. Inspector Benavides testified the shell casings inside the car indicated the shooter was close, possibly arm's length, to the driver's side window when he fired the shots.

The crime-scene investigator told him "two gentlemen" named "C-Rag and PK" were involved in the shooting. *Id.* at 15. Mr. Jones went by C-Rag; Mr. Jones's brother,

-7-

Jacara Jones, went by PK.

The additional eyewitnesses who were in the parking lot at the time of the shooting "refused to talk to [the police]." *Id.* at 40-41.

d. *Mr. Jones's arrest*

Inspector Benavides also testified about Mr. Jones's arrest. The police arrested Mr. Jones at his home the morning after the shooting. A white two-door Monte Carlo was parked outside the house. The rear bumper on the passenger's side was damaged and it appeared there was "contact with the asphalt . . . you could see the scratches and the scrape." *Id.* at 28.

After receiving a *Miranda* warning, Mr. Jones agreed to make a statement. He denied any involvement in the shooting and stated he arrived home the previous night around 12:30 to 1:00 a.m. He stated he got off work, went to the gym, and helped a friend move furniture in an area across town from Slick Willie's and the Cricket parking lot.

Cell phone records showed Mr. Jones was in the area of Slick Willie's "about the time that the witnesses stated they saw him there. [The records] also indicated he was in the area of the homicide right at the time that the incident occurred." *Id.* at 29-30.

e. *The state prosecution*

Inspector Benavides testified as follows about the state prosecution of Mr. Jones. Mr. Jones was charged with first-degree murder of Mr. Miles in Oklahoma state court, but the prosecutors dropped the charges because Ms. Palmore refused to testify. She was

-8-

set to be the "main witness on the case." *Id.* at 31. Mr. Miles was a gang member and a

convicted felon, Ms. Palmore was listed as a witness on public records associated with

the State's murder prosecution, and the district attorney could refile the charge against

Mr. Jones.

       f. *Ms. Palmore and the revocation hearing*

The Government did not subpoena or attempt to contact Ms. Palmore to testify at

the revocation hearing.

## 2. **The District Court's Rulings**

During the revocation hearing, the district court concluded the Government had

proved by a preponderance of the evidence that Mr. Jones had committed supervised-

release violations one and two—(1) the prohibition on committing any federal, state, or

local crime and (2) the prohibition on possession of firearms. The court further

concluded the Government failed to prove violation three—(3) association with a felon.[2]

Mr. Jones's counsel objected at the hearing to "all of [Inspector Benavides's] hearsay

statements," asserting they violated Mr. Jones's rights under the Due Process Clause,

Confrontation Clause, and Federal Rule of Criminal Procedure 32.1.

On April 30, 2015, Mr. Jones filed a post-hearing motion to strike Inspector

---

[2] The Government did not cross appeal from this ruling.

-9-

Benavides's hearsay testimony.[3]  On May 21, 2015, the district court denied Mr. Jones's motion, concluding Inspector Benavides's testimony was sufficiently reliable and that a preponderance of evidence established Mr. Jones violated the two conditions of supervised release.  The district court relied heavily on the testimony about Ms. Palmore's statements.  On June 10, 2015, the court issued a separate order revoking the remainder of Mr. Jones's term of supervised release, resulting in a 36-month term of imprisonment, and imposed 10 years of supervised release.

## II.  **DISCUSSION**

Mr. Jones raises three issues on appeal:  (1) whether Federal Rule of Criminal Procedure 32.1(b)(1)(C) requires the district court to apply a balancing test to determine whether hearsay evidence may be considered for revocation, (2) whether the district court abused its discretion because it did not apply the Rule 32.1(b)(1)(C) balancing test, and (3) whether such error was harmless.  We address these issues in turn and conclude the district court committed reversible error when it failed to apply the Rule 32.1(b)(1)(C) balancing test to the hearsay evidence presented at the revocation hearing.  We confine our analysis to Mr. Jones's right to confront Ms. Palmore because Mr. Jones has not argued on appeal that he has a right to confront any other hearsay declarant.

---

[3] Mr. Jones's in-court objection and motion to strike appeared to challenge all of Inspector Benavides's hearsay testimony—he does not specify any portions of the testimony to which he objects.  On appeal, he limits his challenge to Inspector Benavides's testimony about Ms. Palmore's statements.  He does not challenge the testimony about Mr. Nguyen's statements or any other out-of-court statements.

-10-

"We review the district court's decision to revoke supervised release for abuse of discretion. Legal questions relating to the revocation of supervised release are reviewed *de novo*. A district court necessarily abuses its discretion when it makes an error of law." *United States v. LeCompte*, 800 F.3d 1209, 1215 (10th Cir. 2015) (quotations omitted).

## A. *The Rule 32.1(b)(2)(C) Balancing Test Applies*

The first issue is whether Rule 32.1(b)(2)(C) requires a district court to apply the balancing test to determine whether hearsay evidence may be considered for revocation. We hold that it does.

Rule 32.1(b)(2)(C) was amended in 2002 to state that a person subject to a revocation hearing "is entitled to," among other things, "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C).

The advisory committee notes to this provision provide:

> Rule 32.1(b)(1)(B)(iii) and Rule 32.1(b)(2)(C) address the ability of a releasee to question adverse witnesses at the preliminary and revocation hearings. Those provisions recognize that the court should apply a balancing test at the hearing itself when considering the releasee's asserted right to cross-examine adverse witnesses. *The court is to balance the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it.*

Rule 32.1 advisory committee's note to 2002 amendment (emphasis added).

Before the 2002 amendment to Rule 32.1, this court applied a reliability test to determine whether hearsay evidence may be considered at a revocation hearing. The reliability test "allows the admission of hearsay evidence without a showing of cause for

-11-

the declarant's absence if the evidence is sufficiently reliable." *Curtis v. Chester*, 626

F.3d 540, 545 (10th Cir. 2010).[4] Since the 2002 amendment, we have not needed to

confront the impact of amended Rule 32.1(b)(2)(C) on our pre-2002 precedent. The

closest we have come to addressing that question was in *Curtis*, but we determined both

the reliability test and the balancing test would produce the same outcome in that case.

In this case, we resolve the question and hold the Rule 32.1(b)(2)(C) balancing test

governs whether hearsay evidence may be used to revoke supervised release. The

following discussion provides the background and rationale for this holding.

## 1. *Morrissey v. Brewer*, **408 U.S. 471 (1972)**

In *Morrissey*, the Supreme Court stated, "the revocation of parole is not part of a

criminal prosecution and thus the full panoply of rights due a defendant in such a

proceeding does not apply to parole revocations." 408 U.S. at 480. The Court held a

supervised releasee facing revocation of parole must receive the "minimum requirements

of due process," including "the right to confront and cross-examine adverse witnesses

(unless the hearing officer specifically finds good cause for not allowing confrontation)."

*Id.* at 489. Our unpublished decisions recognize that minimum due process extends to

---

[4] "Examples of evidence possessing recognized indicia of reliability include: (1) the conventional substitutes for live testimony (e.g., affidavits, depositions, and documentary evidence), (2) statements falling under an established exception to the hearsay rule, (3) statements corroborated by detailed police investigative reports, and (4) statements corroborated by the releasee's own statements." *Curtis*, 626 F.3d at 545. "Corroborating evidence is often key to determining whether a statement is sufficiently reliable." *United States v. Ruby*, 706 F.3d 1221, 1229 (10th Cir. 2013).

-12-

releasees facing revocation of supervised release, *United States v. Mullane*, 480 F. App'x 908, 910 (10th Cir. 2012) (unpublished); *United States v. Stevens*, 119 F. App'x 222, 225 (10th Cir. 2004) (unpublished), and we agree.

Although *Morrissey* established a right to confrontation, that right is flexible at revocation hearings. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782 n.5 (1973) ("While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence."); *Kell v. U.S. Parole Comm'n*, 26 F.3d 1016, 1020 (10th Cir. 1994) ("Petitioner's right to confront adverse witnesses is not absolute."). And *Morrissey* did not provide a clear test for determining a releasee's confrontation right. *Curtis*, 626 F.3d at 545.

2. **The 2002 Amendment to Rule 32.1**

Rule 32.1 "codif[ied] due process guarantees that apply to revocation hearings." *Ruby*, 706 F.3d at 1226. The rule was amended and expanded in 2002. Among other things, Rule 32.1(b)(2)(C) grants a releasee facing revocation of supervised release "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear."

The advisory committee notes to the 2002 amendment direct courts to apply a balancing test when considering a releasee's confrontation rights at a revocation hearing under Rule 32.1(b)(2)(C): "The court is to balance the person's interest in the

-13-

constitutionally guaranteed right to confrontation against the government's good cause

for denying it." Rule 32.1 advisory committee's note to 2002 amendment.

3. **Circuit Courts' Adoption of the Balancing Test**

Every circuit court except ours has adopted the balancing test. Some circuits did

so before the 2002 amendment. *United States v. Chin*, 224 F.3d 121, 124 (2d Cir. 2000);

*United States v. Comito*, 177 F.3d 1166, 1170 (9th Cir. 1999); *Barnes v. Johnson*, 184

F.3d 451, 454 (5th Cir. 1999); *United States v. Frazier*, 26 F.3d 110, 114 (11th Cir.

1994); *United States v. Bell*, 785 F.2d 640, 642 (8th Cir. 1986). Other circuits did so

after. *United States v. Jordan*, 742 F.3d 276, 279 (7th Cir. 2014); *United States v.*

*Doswell*, 670 F.3d 526, 530 (4th Cir. 2012); *United States v. Jackson*, 422 Fed. App'x.

408, 410-11 (6th Cir. 2011) (unpublished); *United States v. Lloyd*, 566 F.3d 341, 344 (3d

Cir. 2009); *United States v. Stanfield*, 360 F.3d 1346, 1360 (D.C. Cir. 2004); *United*

*States v. Taveras*, 380 F.3d 532, 536 (1st Cir. 2004).

We applied the reliability test in *Kell*, which was decided before the 2002

amendment. 26 F.3d at 1020. In *Curtis*, a 2010 case, we considered whether the

balancing test applies at a parole-revocation hearing under Rule 32.1(b)(1)(B)(iii).[5] The

appellant urged us to abandon the reliability test and adopt the balancing test based on the

amendment and the advisory committee notes. 626 F.3d at 545. We left the question

---

[5] The balancing test applies to both Rule 32.1(b)(1)(B)(iii) and Rule 32.1(b)(2)(C).
Rule 32.1 advisory committee's note to 2002 amendment.

-14-

open, concluding the hearsay testimony at issue was admissible under both the balancing and reliability tests. *Id.* at 546-47. In doing so, we acknowledged that the 2002 amendment "cast[s] some doubt on our case law," and that *Kell* is "asynchronous with both the majority of circuit courts and the subsequent amendment to Rule 32.1." *Id.* at 545-46.

4. **The Balancing Test Applies**

We join the other circuits and conclude the balancing test applies when determining a releasee's confrontation rights at a revocation hearing. Taking the plain language of Rule 32.1(b)(2)(C) and the advisory committee notes together, we must determine whether the "interest of justice does not require the witness to appear" by balancing (1) "the person's interest in the constitutionally guaranteed right to confrontation" against (2) "the government's good cause for denying it."[6] Rule 32.1 advisory committee's note to 2002 amendment. We note "reliability is a very important factor in determining the strength of a releasee's confrontation right." *Curtis*, 626 F.3d at 546 (emphasis omitted).

We acknowledge our departure from *Kell*, which applied the reliability test before Rule 32.1 was amended. We may depart from precedent without en banc review when an

---

[6] Courts give weight to the advisory committee notes unless they contradict the plain language of the rule. *See Schiavone v. Fortune*, 477 U.S. 21, 31 (1986) ("Although the Advisory Committee's comments do not foreclose judicial consideration of the Rule's validity and meaning, the construction given by the Committee is of weight." (quotations omitted)).

amendment to an applicable rule or statute creates a new standard. *See United States v. Savani*, 733 F.3d 56, 62 (3d Cir. 2013) ("Although we, as a three-judge panel, are generally bound by prior decisions of this Court, we may reevaluate a precedent in light of intervening authority and amendments to statutes or regulations." (quotations omitted)); *Landreth v. C.I.R.*, 859 F.2d 643, 648 (9th Cir. 1988) (reexamining precedent in light of intervening amendment to controlling statute). Put differently, we may apply a new governing standard embodied in an amended rule without en banc reversal of pre-amendment precedent applying a different standard.

No panel since the 2002 amendment, including the *Curtis* panel, has adopted the reliability test in favor of the balancing test. Moreover, *Kell* was decided before the 2002 amendment and did not rely on any federal rule of criminal procedure. We therefore adopt the Rule 32.1(b)(2)(C) balancing test without en banc review of *Kell*.

B. ***The District Court Abused Its Discretion by Failing to Apply the Balancing Test***

The second issue is whether the district court applied the balancing test. The Government argues that it did. Mr. Jones argues it did not. We agree with Mr. Jones and conclude the court's legal error was an abuse of discretion.

The Government argues the district court applied the balancing test because the court quoted both Rule 32.1(b)(2)(C) and the advisory committee notes and weighed the reliability of the hearsay evidence against the "gravity of the matter." ROA, Vol. I at 43. We disagree. Mentioning the rule and advisory notes is not the same as applying them.

In the order denying Mr. Jones's motion to strike, the district court found

-16-

Inspector Benavides's testimony reliable and probative of the Government's contention that Mr. Jones murdered Mr. Miles. In particular, due to the corroborating physical evidence, the court found reliable Inspector Benavides's testimony about Ms. Palmore's account of the shooting and gave it "decisive effect." *Id.* at 42. The court also pointed to Inspector Benavides's testimony about Ms. Palmore's insistence that Mr. Jones was the shooter and about Mr. Jones's false alibi.

Although the district court considered reliability and the "gravity of the matter," it did not apply the Rule 32.1(b)(2)(C) balancing test. ROA, Vol. I at 43. Reliability is relevant to determine Mr. Jones's interest in confrontation, *Curtis*, 626 F.3d at 546—the first part of the balancing test—but the district court did not fully or adequately address Mr. Jones's interest in cross-examination or the second part of the balancing test—the Government's explanation for failing to present Ms. Palmore as a witness.

Because the district court failed to apply the balancing test under Rule 32.1(b)(2)(C), it committed legal error and therefore abused its discretion. *LeCompte*, 800 F.3d at 1215 ("A district court necessarily abuses its discretion when it makes an error of law." (quotations omitted)).

### C. *The District Court's Error Was Reversible*

The third issue is whether the district court's error was reversible or harmless. We conclude it was reversible.

### 1. **Harmless Error Standard**

The harmless error doctrine requires us to disregard preserved trial errors that do

-17-

not affect substantial rights.  *See* 28 U.S.C. § 2111; Fed. R. Crim. P. 52(a).  "An error is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect."  *United States v. Stiger*, 413 F.3d 1185, 1190 (10th Cir. 2005) (quotations omitted).  A constitutional error is reversible unless the Government can prove harmlessness beyond a reasonable doubt.  *Chapman v. Cutler*, 386 U.S. 18, 24 (1967).  A nonconstitutional error is reversible unless the Government can prove harmlessness by a preponderance of the evidence.  *Stiger*, 413 F.3d at 1190.

In this case, we need not determine whether an error in applying Rule 32.1(b)(2)(C) is constitutional or nonconstitutional because the Government cannot show harmlessness under either standard.

2.  **Analysis**

The district court's error is reversible.  We have grave doubt as to whether the court would have admitted the testimony under the Rule 32.1(b)(2)(C) balancing test on the record before it.  And because Inspector Benavides was the only witness and the court gave his testimony about Ms. Palmore's statements "decisive effect," ROA, Vol. I at 42, it follows that the court's error affected Mr. Jones's substantial rights.

First, Mr. Jones had a strong interest in testing Ms. Palmore's statements to Inspector Benavides.  Several textbook bases for cross-examination were present here:

- First, testing Ms. Palmore's ability to perceive—her distance from the parking lot, her angle of vision, any obstructions to her view, the quality of the lighting, and whether she had been drinking at Slick Willie's.

-18-

- Second, exploring possible bias—whether her long-term acquaintance with Mr. Jones might have affected her statements to Inspector Benavides.

- Third, examining whether Ms. Palmore's prior conviction might affect her credibility.

- Fourth, asking why Ms. Palmore refused to cooperate in the state prosecution of Mr. Jones, a matter on which the parties and the court could only posit educated guesses without her testimony.

- Fifth, elaborating on Ms. Palmore's misidentification of Mr. Jones in the photo lineup. Despite corroborating evidence that placed Mr. Jones in the parking lot at the time of the shooting, Ms. Palmore pointed to someone else when asked to identify the shooter.

Adding to Mr. Jones's interest in cross-examining Ms. Palmore are the generally recognized concerns with eyewitness testimony even when the witness appears at the evidentiary proceeding. *See, e.g.*, *Manson v. Brathwaite*, 432 U.S. 98, 119 (1977) (noting the "high incidence of miscarriage of justice resulting from the admission of mistaken eyewitness identification evidence at criminal trials" (quotation omitted)); *United States v. Wade*, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); *United States v. Stevens*, 935 F.2d 1380, 1392, 1407 (3d Cir. 1991) (noting concerns with reliability of eyewitness testimony and holding district court erred in excluding expert testimony "about the lack of a correlation between confidence and accuracy in eyewitness identifications"); *United States v. Smith*, 736 F.2d 1103, 1106 (6th Cir. 1984) (acknowledging "the dangers of [eyewitness] misperception in criminal cases").

Second, the Government has made only a limited showing of good cause for its failure to produce Ms. Palmore to testify. The Government argues on appeal that Ms. Palmore risked retaliation because she was the only witness to a gang-related shooting, her name was on public records associated with the State's murder prosecution, and she refused to cooperate with the State. The Government further asserts any attempt to subpoena Ms. Palmore would have been futile.

The Government has not adequately supported its argument. It did not even ask Ms. Palmore to attend the revocation hearing. Nor did it issue her a subpoena. Instead, it asks us to infer Ms. Palmore refused to testify at the state court trial based on a fear of reprisal and would have refused to testify at the revocation hearing for the same reason. Although we could reasonably infer as the Government suggests, we could also reasonably infer Ms. Palmore's refusal to testify at the state trial arose out of other reasons. She may have doubted whether Mr. Jones was actually the shooter. Or she may have been lying when she insisted Mr. Jones was the shooter. Or perhaps she did not want to testify against her longtime acquaintance.

Weighing Mr. Jones's strong interest in confrontation and cross-examination against the Government's limited showing of good cause, we are left in grave doubt as to whether the district court would have admitted Inspector Benavides's testimony under the balancing test on the record presented and also as to whether it would have revoked Mr. Jones's supervised release. We therefore conclude the district court's error was

reversible because the Government cannot show harmlessness by a preponderance of the evidence, let alone beyond a reasonable doubt.

## D. *Sixth Amendment Right to Confrontation*

Mr. Jones also argues his inability to cross-examine Ms. Palmore violated his Sixth Amendment rights. The parties agree our case law holds that the Sixth Amendment does not apply to revocation hearings. *Curtis*, 626 F.3d at 544 ("Sixth Amendment rights are not applicable in parole revocation hearings because those hearings are not criminal prosecutions." (quotation omitted)). Nevertheless, Mr. Jones raises the argument "so as to preserve any future extension of the Sixth Amendment." Aplt. Br. at 26. We agree that our case law forecloses the argument.

## III. **CONCLUSION**

For the reasons stated, we reverse the district court's revocation of Mr. Jones's supervised release and remand for a new revocation hearing consistent with this opinion.