**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 3, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

 Plaintiff - Appellee,

v.

ANDREW CHARLES DAVIS,

 Defendant - Appellant.

No. 19-1292
(D.C. No. 1:14-CR-00424-PAB-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **SEYMOUR**, **BALDOCK**, and **MURPHY**, Circuit Judges.

_____

After examining the briefs and appellate record, this court has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2)(C); 10th Cir. R. 34.1(G). Accordingly, we honor the parties' requests and order the case submitted without oral argument.

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Andrew Charles Davis appeals from an order of the United States District Court for the District of Colorado revoking his supervised release. Davis asserts the district court erred by allowing the government to rely on hearsay evidence at the revocation hearing without first conducting the balancing test set out in Fed. R. Crim. P. 32.1(b)(2)(C). *See United States v. Jones*, 818 F.3d 1091, 1098-1100 (10th Cir. 2016) (holding that "the Rule 32.1(b)(2)(C) balancing test governs whether hearsay evidence may be used to revoke supervised release"). The government, in response, asserts the district court did, although only implicitly, conduct the required balancing and, in any event, any error on the part of the district court is harmless. It is unnecessary to resolve whether the district court conducted the required balancing because, even assuming error, the admission of hearsay evidence by the district court in this particular case is harmless. Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the order of the district court revoking Davis's supervised release.

After serving a forty-one-month term of imprisonment for violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Davis began serving a three-year term of supervised release. One of the conditions of Davis's supervised release was that he reside in a residential reentry center ("RRC") and "observe the rules of that facility." Davis began living at an RRC in Denver, Colorado, on March 29, 2019. Five weeks later, on May 8, 2019, the RRC director rejected the placement due to

Davis's lack of "desire to abide by the RRC rules and regulations." In response to Davis's rejection from the RRC, his probation officer filed a petition to revoke Davis's supervised release. The revocation petition alleged, in pertinent part, that during Davis's time at the RRC, he failed to follow the facility's rules and regulations.[1] This failure was, the revocation petition explained, a violation of the rules of Davis's supervised release.

Prior to Davis's revocation hearing, the government filed a motion asking the district court to "conduct a balancing test pursuant to *United States v. Jones*, 818 F.3d 1091, 1098 (10th Cir. 2016) and Fed. R. Crim. P. 32.1(b)(2)(C) and hold that the interest of justice does not require certain witnesses to appear."[2] The government requested that three security employees who had documented Davis's rules violations be excused from appearing and, in lieu of testimony, their written

---

[1]The revocation petition alleged that Davis's rules violations included:

> being out of location; failing to make all . . . required location calls; being unaccountable in the community; returning late to the facility; leaving the marked perimeter of the RRC without authorization; possession of an unauthorized smart phone on two occasions; and, failing to abide by a direct and lawful order on two occasions.

[2]Under Rule 32.1(b)(2)(C), a court "must determine whether the interest of justice does not require the witness to appear by balancing (1) the person's interest in the constitutionally guaranteed right to confrontation against (2) the government's good cause for denying it." *United States v. Jones*, 818 F.3d 1091, 1099-1100 (10th Cir. 2016) (quotations omitted). "[R]eliability is a very important factor in determining the strength of a releasee's confrontation right." *Id.* at 1100 (quotation omitted).

reports be admitted. The government argued that because three other RRC employees would already be testifying, requiring the security employees to appear in court would cut dramatically into the availability of the facility's small, twenty-person staff. According to the government, no temporary solution could cover that staffing gap because the Bureau of Prisons has to preapprove all of the RRC's employees and there would be insufficient available approved employees. Moreover, the government contended, regular staff could not cover security roles, making the security employees' absences all the more acute.

Davis objected to the government's request. He explained that his theory of the case was that there was a gap between the RRC's rules as written and as applied, which resulted in his "conduct never [rising] to the level of constituting a violation." Instead, Davis asserted, the decision to terminate him from the RRC "was an improperly subjective one." With that theory in mind, Davis asserted the need for reliability weighed against the government's request. That is, it was important to hear from the person who witnessed each alleged rules violation to determine whether some residents were actually permitted to engage in the alleged conduct with impunity. This need was heightened, Davis alleged, by the cursory nature of the incident reports and potential that the result of the hearing would be Davis's incarceration "for a significant period of time." As to the question of good cause, Davis asserted the government's staffing concerns could

be eliminated by conducting a bifurcated hearing, with only three of the six witnesses appearing at each portion of the hearing.

At the beginning of the hearing on the government's petition to revoke Davis's supervised release, with no further arguments of the parties, the district court granted the government's request to admit hearsay evidence. The district court's ruling, in its entirety, was as follows:

> So then the next issue becomes, you know, how long this particular hearing is going to take because I have got a 3:00 o'clock and that is going to take place too. And this particular hearing looks like it's lengthy.
>
> First of all, the government's motion, which is Docket No. 89 concerning witnesses, I am going to grant that motion. As the government points out, the Federal Rules of Evidence don't apply at this type of proceeding. However, to the extent that the government is proceeding by hearsay, that goes to the weight of the evidence, so something proved up by hearsay, at least arguably it does not have the same weight as if it were proved up by virtually having a witness present who was subject to cross-examination.
>
> In light of that ruling, then, [Assistant United States Attorney] how long do you think your witnesses are going to take [on] direct?

Although the government initially alleged several incidents during which Davis failed to follow RRC rules, *see supra* n.1, the district court narrowed that list to two allegations, ones the district court found animated the decision to terminate Davis's placement. These incidents involved claims Davis twice possessed an unauthorized phone and/or smart phone and refused orders to turn the device(s) over to staff.

The first incident was recounted by Ronald Martinez, an RRC security staff member, who had firsthand knowledge of one of the incidents.[3] Martinez testified that on April 1, 2019, he conducted a random search of Davis's room. He observed Davis retrieve a phone charger from the window sill and noticed something in Davis's pocket he believed to be a phone. When he asked Davis for the phone, Davis refused to comply.[4] Martinez prepared a report about the incident and placed a hold on Davis, meaning he was prevented from leaving the RRC until he got the phone approved.[5] Davis got a phone, a rules-compliant flip

---

[3]Notably, Martinez also testified that he did Davis's intake at the RRC. During Davis's intake he specifically complained to Martinez about the rules that prevented him from having a smart phone and expressed his desire to obtain such a phone. Martinez told Davis several times that Davis was required to take up the matter with his case manager.

[4]Martinez testified as follows:

   He had something in his pocket. He went to the window sill, got the phone charger. So I told him, "Can I have that phone?" He told me, "No." And I said, "Okay. Well, I am going to give you a "DLO," which is a direct lawful order to give me his phone. He said, "No."

   And I said, "We just went over this. I just went over this with you a few days ago about the phone." And I said, "You have to have it authorized and you know that." And he said he will get it authorized, but he wouldn't let me take it. So at that time he was placed on total hold for refusing a direct lawful order.

[5]Davis's probation officer, Walter Vanni, testified Davis acknowledged during a phone conversation that he possessed a smart phone on April 1st. Vanni testified as follows:

(continued...)

phone, approved by staff the following day and there were no other sanctions that

---

[5](...continued)

A. I was informed that the defendant had a smart phone and that he refused to turn that smart phone over.

Q. You were informed the defendant possessed a smart phone on April 1st, 2019?

A. That was the conversation I had with the defendant and his case manager over the phone.

Q. You spoke to the defendant about this?

A. And the case manager at the same time on speaker phone.

Q. What do you recall about that conversation?

A. That the defendant didn't understand why he got the smart phone in Texas but couldn't have a smart phone in Colorado, and that he should have a smart phone and the rules shouldn't apply to him. I instructed him to turn that smart phone over to the halfway house so he could be in compliance, and if he had any arguments about the rules and restrictions, that he could have a conversation to see if he needed to have his conditions modified.

Q. And are you aware that the defendant later turned in a flip phone?

A. Yeah. I was told by the case manager a few days later, I am not sure exactly when, that the defendant told her that he was going to give the smart phone to his cousin and then put a basic flip phone up in her mailbox with a request to use the basic flip phone.

Q. Do you know if he was ever able to get that flip phone activated?

A. From what I understand, she approved it. Activated, I am not too sure, just that it was approved.

flowed from this violation.[6]

The second incident involved a staff member named Abraham Mora, one of the witnesses the court permitted the government to exclude. Because Mora was not present at the hearing, the government introduced the hearsay incident report he had prepared through Martinez. Mora's report explained that on May 5, 2019, he observed Davis with an unauthorized smart phone while conducting a random house count. Mora stated that he ordered Davis to turn over the phone, but Davis refused. Davis was again placed on a hold. Martinez testified that when United States Marshals arrived at the RRC on May 15th to take Davis into custody on the arrest warrant accompanying the application to revoke Davis's supervised release, the marshals found Davis in possession of two phones, a prohibited smart phone and a flip phone. Indeed, Martinez saw Davis using the smart phone on May 15th to call someone to come and pick up his belongings from the RRC. Martinez testified that on that date, as well as all previous dates, Davis was precluded by rule from possessing a smart phone.[7]

_____

[6]Davis cross-examined Martinez about this incident. The gist of that cross-examination was (1) how could Martinez be sure Davis had a phone in his pocket and, (2) even if it was a phone in Davis's pocket, possession of an unauthorized phone was not a serious violation.

[7]During his cross-examination of Martinez about this incident, Davis did not ask about inconsistent application of the rules regarding possession of unauthorized phones and/or smart phones. Instead, Davis's questions focused on whether Mora improperly disclosed Davis's status as a sex offender to other RRC

(continued...)

The program director of the RRC, Che Velarde, also testified at the revocation hearing. Velarde explained that he became the RRC's director in late April and received incident reports from that point on. He testified he made the decision to expel Davis based on the May 5th smart phone incident. In particular, Velarde stated that it was the combination of Davis's possession of a prohibited smart phone and his refusal to comply with a proper order to turn the phone over to staff that led him to reject Davis's placement at the RRC.[8]

After the conclusion of the evidentiary hearing, the district court found that Davis violated the condition of supervised release that he reside in an RRC and follow the rules of the facility. The district court focused on the two phone incidents of April 1st and May 5th. The district court recognized the May 5th incident "was proved by hearsay," but concluded it was entitled to weight because the incident report was "perfectly consistent with the testimony of [Martinez] about the defendant being upset with the rules of [the RRC] about his possession of smart phones." Thus, the district court deemed the rules violations proven by

[7](...continued)
residents during the May 5th incident.

[8]Davis specifically cross-examined Velarde about whether the rules regarding unauthorized phones were applied inconsistently and subjectively. Davis asked Velarde whether it was true that during a recent time period three to five individuals were caught with unauthorized cell phones but not terminated from the RRC. Velarde stated that was true, but noted a significant distinction: unlike Davis, none of those individuals had refused to comply with a direct lawful order to turn over the phone after being caught.

the requisite preponderance standard and found that Davis's termination from the RRC was credibly related to those violations. Accordingly, the district court revoked Davis's supervised release and sentenced him to eight months' incarceration, to be followed by an additional two-year term of supervised release.

Davis appeals the revocation of his supervised release, asserting the district court erred in failing to undertake, on the record, the balancing required by Rule 32.1(b)(2)(C) before allowing admission of Mora's incident report regarding the May 5th incident. The government asserts the district court implicitly undertook the necessary balancing when it granted the government's motion to adduce hearsay relating to the May 5th incident. Alternatively, the government asserts any error on the part of the district court is harmless.

There is reason to doubt the government's assertion the district court satisfied its obligation to balance the factors set out in Rule 32.1(b)(2)(C) by merely granting the government's motion to adduce hearsay evidence. *Cf. F.T.C. v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004) (noting, despite the deferential nature of abuse-of-discretion review, "a district court must provide findings of facts on which it bases its judgment sufficient to make possible meaningful appellate review"); *see also United States v. Henry*, 852 F.3d 1204, 1207 (10th Cir. 2017) (holding that a district court's decision to admit evidence under Rule 32.1(b)(2)(C) is reviewed for abuse of discretion). It is unnecessary to resolve

that issue here, however, because any error on the part of the district court is harmless beyond a reasonable doubt.[9]

Substantial non-hearsay evidence corroborated Mora's written report of the May 5th incident. Martinez testified that upon his arrival at the RRC, Davis specifically complained about rules preventing him from having a smart phone. *See supra* n.3. Likewise, Vanni testified that following the April 1st incident, Davis complained that the rules barring possession of a smart phone should not apply to him. *See supra* n.5. The district court explicitly found that such testimony (i.e., Davis's repeated statements that he should be able to possess a smart phone without regard to the rules) corroborated Mora's report, entitling that report to greater weight. Moreover, when marshals arrested Davis on May 15th, they seized two phones from him, including a smart phone. Indeed, Martinez observed Davis speaking on a smart phone that same day. This ample and essentially unrebutted evidence of Davis's unrelinquished possession of a smart phone made Mora's account exceedingly reliable. *Cf. United States v.*

---

[9]A nonconstitutional error is reversible unless the government proves, by a preponderance of the evidence, the error is harmless. *Jones*, 818 F.3d at 1101. A constitutional error, on the other hand, will lead to reversal unless the government proves harmlessness beyond a reasonable doubt. *Id.* This court has not resolved whether errors in applying Rule 32.1(b)(2)(C) are constitutional or nonconstitutional in nature. *Id.*; *see also United States v. Henry*, 852 F.3d 1204, 1209 n.2 (10th Cir. 2017). Because the assumed error here is harmless under the more rigorous standard applied to constitutional error, it is unnecessary to resolve that issue in this appeal. *See id.*

*Washington*, 38 F. App'x 522, 525 n.4 (10th Cir. 2002) (unpublished disposition cited solely for its persuasive value) ("[C]ourts have previously considered extrinsic evidence of corroboration in determining whether hearsay evidence was sufficiently reliable to be admitted and considered in revocation proceedings."). This evidence likewise establishes the reliability of the assertion in Mora's incident report that Davis refused a direct order to turn over the smart phone in his possession on May 5th.

Of course, reliability alone does not resolve the question of harmlessness. *Jones*, 818 F.3d at 1099. Davis has not, however, elaborated on his interest in testing Mora's statements through cross-examination. *See id.* at 1101. Davis never questioned Mora's account and never attempted to argue against its veracity. Thus, "[t]he key factual allegations contained in the hearsay evidence" —that Mora observed a phone and gave Davis a direct order that was refused— "were not disputed at [Davis's] revocation hearing, and they are not disputed on appeal." *United States v. Kokoski*, 435 F. App'x 472, 476 (6th Cir. 2011) (unpublished disposition). This means Davis has not identified a meaningful interest in confronting Mora about the May 5th incident. "All of this by definition establishes harmlessness— that admission of the . . . report[] did not alter the outcome of the proceeding." *Id.*; *see also United States v. Walker*, 117 F.3d 417, 421 (9th Cir. 1997) (holding that "any error in failing to apply the

-12-

balancing test was harmless" where defendant "did not challenge the reliability of the evidence nor offer any contrary evidence").

To be clear, Davis consistently asserted a general interest in confrontation to show disparate application of RRC rules. He argued at the revocation hearing as follows: (1) his discharge was unfair because he lacked notice that improper possession of a smart phone merited a discharge; (2) he received disparate treatment as a sex offender; and (3) he did not make illegal use of the unauthorized phone. Importantly, the district court viewed such arguments as irrelevant. According to the district court, it was not "appropriate to go into a lot of second-guessing about the rules and why there are rules and whether the rules should be followed or not followed." This was especially true, according to the district court, because Davis had not adduced any evidence indicating he could have reasonably thought he was entitled to possess a smart phone. Thus, pressing that point further by confronting Mora, would not have had any meaningful influence on the outcome of the revocation proceeding. This is especially true given that Davis had a full opportunity to cross-examine Velarde, the person who made the decision to terminate Davis's placement at the RRC, about whether the smart phone limitation was applied in a subjective or inconsistent fashion.[10]

---

[10]Davis asserts that this court's decision in *Henry* mandates a determination that the error here had a substantial and injurious effect on his revocation

(continued...)

For those reasons set out above, this court concludes that the district court's assumed *Jones* error is harmless beyond a reasonable doubt. Mora's report was highly reliable, and Davis's interest in confronting Mora was minimal. That being the case, even a weak interest in avoiding disruption at the RRC sufficed to justify the admission of hearsay. Because the record no doubt demonstrates, at a minimum, the existence of such a weak interest, the district court's admission of Mora's report is harmless beyond a reasonable doubt. Thus, the order of the district court revoking Davis's supervised release is hereby **AFFIRMED**.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge

---

[10](...continued)
proceeding. In *Henry*, however, one of three violations of the terms of the defendant's supervised release was infected with injurious Rule 32.1(b)(2)(C) error. 852 F.3d at 1206, 1207-08. The government argued the error was harmless because the district court concluded revocation was appropriate as to each of the three individual violations. *Id.* at 1208-09. This court rejected that rationale because the district court considered all three violations in fashioning a sentence. *Id.* In this case, on the other hand, we have concluded beyond a reasonable doubt that the *Jones* error did not have a substantial and injurious effect on the sole violation found by the district court. Thus, *Henry* is simply not relevant.